**CONSUMER WATCHDOG**
Jerry Flanagan (SBN: 271272)
Jerry@consumerwatchdog.org
Daniel L. Sternberg (SBN: 329799)
Danny@consumerwatchdog.org
Benjamin Powell (SBN: 311624)
Ben@consumerwatchdog.org
6330 San Vicente Blvd., Suite 250
Los Angeles, CA 90048
Tel: (310) 392-0522
Fax: (310) 392-8874

**BARTA LAW, P.C.**
Theresa J. Barta (SBN: 150995)
Theresa@barta-law.com
4041 MacArthur Blvd., Suite 280
Newport Beach, CA 92660
Tel: (949) 833-3383
Fax: (949) 209-2530

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTIN SMITH, on behalf of himself and the general public,<br><br>Plaintiff,<br><br>vs.<br><br>JAY J. PATEL, M.D.; JAY J. PATEL, MD, INC.; ORTHOPAEDIC SPECIALTY INSTITUTE MEDICAL GROUP OF ORANGE COUNTY; and Does 1 through 50, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>(1) Violation of Anti-Discrimination Provisions of Affordable Care Act, 42 U.S.C. § 18116<br><br>(2) Violation of Americans with Disabilities Act, 42 U.S.C. §§ 12182 *et seq.*<br><br>(3) Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.*<br><br>(4) Violation of Unruh Civil Rights Act, Cal. Civ. Code §§ 51 *et seq.*<br><br>(5) Violation of Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.     This is an action by Justin Smith against Dr. Jay J. Patel; Orthopaedic Specialty Institute Medical Group of Orange County; Jay J. Patel, MD, Inc.; and DOES 1 through 50 (collectively referred to herein as "Defendants"). Mr. Smith was diagnosed with HIV over 30 years ago but nonetheless has maintained good health. During this three-decade-long period, he has never had any health issue related to having HIV. The presence of the HIV virus is virtually undetectable in his body as a result of his adherence to antiretroviral therapies. Defendants nevertheless blatantly discriminated against Mr. Smith on the basis of his HIV status, in a manner harkening back to the hysteria and baseless discrimination that existed during the earliest days of the HIV/AIDS epidemic.

2.     When Mr. Smith sought a hip replacement surgery in May 2020, Defendants refused to provide the surgery on the basis of his HIV status—reflecting and perpetuating stigma based on outdated perceptions of prognosis and transmission risks of people living with HIV. Defendants' refusal was discriminatory on its face, because it rested on stereotypes of the disabled rather than an individualized inquiry into the patient's condition. Specifically, Defendants failed to make an assessment of Mr. Smith's fitness for surgery. Instead, after summarily deciding that Mr. Smith was immunocompromised, which was based on nothing more than stereotype about people living with HIV, Dr. Patel refused to speak with Mr. Smith's primary care physician regarding his HIV viral load (referring to the number of viral particles in his blood) or T-cell count—key indicators of whether an HIV patient actually is immunocompromised. Dr. Patel did so

over Mr. Smith's protests that he was not immunocompromised, never reviewed Mr. Smith's medical history related to his HIV diagnosis, and refused to contact Mr. Smith's physician treating his HIV. Nor did Dr. Patel at any time review Mr. Smith's HIV blood test results or perform any other type of examination. Rather, Dr. Patel engaged in blatant discrimination against Mr. Smith, and was insensitive and rude. The doctor's office was the one place where Mr. Smith thought he would be safe from the discrimination and stigma caused by HIV, but instead, Dr. Patel exposed and amplified one of his biggest anxieties. Mr. Smith was subjected to injury and indignity when Defendants relied on pretextual excuses for refusing to perform hip replacement surgery on him.

3.      Mr. Smith alleges that Defendants' actions and policies violate Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116, the Americans with Disabilities Act, 42 U.S.C. §§ 12182 *et seq*., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq*., and California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51 *et seq*., which prohibit discrimination on the basis of disability. He brings this action for compensatory and punitive damages for the loss of rights, humiliation, embarrassment, and emotional distress he suffered as a result of this explicit, brazen discrimination. These civil rights laws require individualized patient assessments based on objective medical evidence and remain in effect and were in effect at all times relevant to this Complaint.

4.      Mr. Smith also seeks public injunctive relief pursuant to *McGill v. Citibank*,

2 Cal. 5th 945 (2017) on behalf of the general public to ensure that no other patient of Defendants living with HIV or other disabling health conditions experience discrimination when seeking medical care.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, and 28 U.S.C. § 2202. The Court's exercise of supplemental jurisdiction over Plaintiff's state law claims is proper pursuant to 28 U.S.C. § 1367 as the state and federal claims arise from the common nucleus of operative facts.

6.      Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendants reside in the District and the events and omissions giving rise to the claims occurred within this District.

## PARTIES

7.      Plaintiff Justin Smith is a resident of Los Angeles County, California.

8.      Defendant Jay J. Patel, M.D. ("Dr. Patel") is a physician licensed to practice medicine in California. His primary area of practice is orthopedic surgery. On information and belief, Dr. Patel's primary work address is 280 S. Main St., Suite 200, Orange, California. Dr. Patel provides medical care to individuals for whom payment is made through Medicare. Therefore, Dr. Patel is a recipient of "federal financial assistance" for purposes of 42 U.S.C. § 18116 and 29 U.S.C. §§ 701 *et seq*. He is affiliated with Defendant Orthopaedic Specialty Institute Medical Group of Orange

County and, on information and belief, has an ownership interest in this entity. At all times relevant, Dr. Patel was an agent, employee, shareholder, and/or partner of this entity. He is also a partial owner of Hoag Orthopedic Institute, a physician-owned hospital developed in partnership with Hoag Memorial Hospital Presbyterian, where Dr. Patel performs hip replacement surgeries at all relevant times herein.

9.      Defendant Jay J. Patel, MD, Inc. is a California corporation with a registered office at 280 S. Main St., Suite 200, Orange, California. Jay J. Patel, MD, Inc. provides medical care to individuals for whom payment is made through Medicare. Therefore, Jay J. Patel, MD, Inc. is a recipient of "federal financial assistance" for purposes of 42 U.S.C. § 18116 and 29 U.S.C. §§ 701 *et seq.* Jay J. Patel, MD, Inc. is vicariously and/or contractually liable for the actions of its principals, agents, employees, shareholders, and/or partners. Dr. Patel is the sole director and officer of Jay J. Patel, MD, Inc.

10.     Defendant Orthopaedic Specialty Institute Medical Group of Orange County ("OSI") is a medical practice with its principal place of business in Orange County, California and a registered office at 280 S. Main St., Suite 200, Orange, California. OSI is affiliated with Hoag Orthopedic Institute. The OSI medical practice is composed of 36 doctors and other healthcare providers, including Dr. Patel. Affiliated doctors provide medical services through OSI. At all times relevant, OSI employed the services of doctors and held itself out and warranted itself to the public as competent, careful, and experienced in the care and treatment of patients. OSI provides medical care to

individuals for whom payment is made through Medicare. Therefore, OSI is a recipient of "federal financial assistance" for purposes of 42 U.S.C. § 18116 and 29 U.S.C. §§ 701 *et seq*. The medical care at issue in the Complaint was provided at OSI facilities and/or by OSI personnel. OSI is vicariously and/or contractually liable for the actions of its principals, agents, employees, shareholders, and/or partners.

11.     The true names, roles, and capacities in terms of their involvement in the wrongdoing at issue, whether individual, corporate, associate, or otherwise of Defendants named as DOES 1 through 50, inclusive, including reviewing, approving, or ratifying the conduct at issue, are currently unknown to Plaintiff. Plaintiff will identify their true identities and their involvement in the wrongdoing at issue if and when they become known.

## FACTS

12.     Plaintiff Justin Smith is a 55-year-old man, a small business owner, and an avid traveler, and enjoys exercising, swimming, and other outdoor activities. He was diagnosed with HIV in 1986.

13.     As a person living with HIV, Mr. Smith is a qualified individual as defined by the Affordable Care Act, 42 U.S.C. § 18116, Americans with Disabilities Act, 42 U.S.C. § 12102, Rehabilitation Act of 1973, 29 U.S.C. § 705(20), Unruh Civil Rights Act, Cal. Civ. Code § 51(e)(1), Cal. Gov't Code § 12926(m), and Cal. Gov't Code § 12926.1(c).

14.     In 1986, when Mr. Smith was diagnosed with HIV, there was no approved treatment, but remarkably, he remained healthy. At no time in the next 13 years did he become immunosuppressed or require medications subsequently made available for the treatment of HIV.

15.     In 1999, Mr. Smith began taking the new cocktail of antiretroviral medications ("antiretroviral therapy" or "ART"), which were immediately effective for him. He has remained on these medications as they have progressed in the subsequent years, and he is now on a one-pill-a-day regime for his HIV treatment. Mr. Smith has remained HIV undetectable and maintained an exceptionally high T-cell level throughout this twenty-one-year period.

16.     He has continued to obtain comprehensive care regimens from specially trained immunologists as well as general care practitioners for HIV-related conditions and medications.

17.     Due to Mr. Smith's strict adherence to his HIV medication regimen, his HIV viral load has remained undetectable, which means the amount of HIV in his blood is so low it could not reliably be measured by standard viral load tests. Additionally, his T-cell count, a measure of healthy immune function, has been in the high-normal range.

18.     At all times relevant to this action, Mr. Smith's HIV was well-controlled by treatment and, because of his adherence to his HIV medication regimen, he shows no signs of a compromised immune system.

19.     In sum, Mr. Smith has done an exceptionally good job over the past 34 years of managing his health, according to his primary care physician.

20.     Given Mr. Smith's strong immune counts, he is not at a higher risk of a poor surgical outcome compared to an HIV negative patient.

**Treatment of HIV Has Progressed Dramatically, But the Disease's Stigma Has Persisted**

21.     Mr. Smith is a testament to the fact that the landscape of HIV treatment and prevention, the ramifications of an HIV diagnosis, and the prognosis for people living with HIV have all changed dramatically since the virus was first identified in the 1980s.

22.     In 1996, ART treatment for HIV became widely available, resulting in an effective treatment regimen for nearly every person living with HIV. This radically shifted health outcomes for people living with HIV. With adherence to ART treatment, the viral load of a person living with HIV is decreased so low within several months that it cannot be detected. While a person in the acute or secondary stage of infection could have a viral load of one million or more, a person in successful treatment will have a viral load of less than 200, which is considered "virally suppressed," or a viral load of less than 48 to 50, which is referred to as an "undetectable" viral load.

23.     Within six months of starting ART, a person living with HIV will almost invariably reach an undetectable viral load. If the individual remains on ART, the virus remains suppressed and the person can have the same life expectancy as if the virus had never been acquired in the first place. Furthermore, the chance of transmission is

effectively zero when a person living with HIV has an undetectable viral load. In other words, these antiretroviral drugs can stop HIV in its tracks.

24.    For Mr. Smith, and the great majority of people living with HIV today, though devastating societal stigma persists, medical treatment renders HIV nearly inconsequential to their daily lives. So long as they adhere to the treatment protocol, antiretroviral therapies allow people living with HIV to lead full and healthy lives. For example, with adherence to HIV medication regimes, most people living with HIV have no symptoms or significant effects on their immune systems. Importantly, with sustained viral suppression, people living with HIV can stay healthy. They do not experience any noticeable effects on their physical health.

25.    Despite the exceptional advancement in the treatment of this disease, HIV remains one of the most stigmatized diseases in history. Many with HIV live in fear and anxiety of being discriminated against and stigmatized should their HIV status be disclosed. Mr. Smith compares the psychological weight as comparable to the burden of a "scarlet letter" or a Yellow Star during the Nazi Era. That is, individuals live in fear that they will be dehumanized and isolated once this badge is revealed to others.

26.    Even today, many responses to HIV remain rooted in fear and stigma rather than science and reason. For example, a national survey conducted in 2012 as part of The Washington Post/Kaiser Family Foundation Survey Project's work on HIV/AIDS found that fewer than half of respondents indicated that they would feel "very

comfortable" working with someone who had HIV or AIDS. The Washington Post and

Kaiser Family Foundation, *2012 Survey of Americans on HIV/AIDS* (2012),

https://www.kff.org/hivaids/poll-finding/2012-survey-of-americans-on-hivaids/.

27.     Only a third of respondents indicated that they would feel "very

comfortable" with having a roommate who was HIV positive, and fewer than a quarter

would feel "very comfortable" having food prepared by someone who was HIV positive.

*Id.*

28.     Related follow-up surveys published as recently as 2017 and 2019 revealed

similarly harmful and entrenched stigma towards people living with HIV. *See* Kaiser

Family Foundation, *National Survey of Young Adults on HIV/AIDS* (2017),

https://www.kff.org/hivaids/report/national-survey-of-young-adults-on-hiv-aids/; Kaiser

Family Foundation, *KFF Health Tracking Poll – March 2019: Public Opinion on the*

*Domestic HIV Epidemic, Affordable Care Act, and Medicare-for-all* (2019),

https://www.kff.org/hivaids/poll-finding/kff-health-tracking-poll-march-2019/.

29.     Unfortunately, yet very starkly, patent bias and discrimination resulting from

antiquated stereotypes and stigma continue today against people living with HIV.

30.     If anywhere a person living with HIV can seek respite from the crushing

weight of HIV-related stigma, it is in the presence of medical professionals whose

training should elevate their understanding of the disease. Yet Dr. Patel played into the

stigma in every possible way, causing Mr. Smith even greater anguish by stripping back

COMPLAINT

the safety of the doctor's office. Dr. Patel's lack of compassion and blatantly hostile and discriminatory treatment is unacceptable.

**Initial Treatment at OSI**

31.     Mr. Smith was diagnosed with advanced hip arthritis in 2018, for which he received continuous care. As this medical condition progressed, in January 2020 Mr. Smith decided to seek hip replacement surgery as a potential treatment for his advanced arthritis.

32.     Mr. Smith called OSI's office and made an appointment for February 3, 2020.

33.     At the time, his decision to seek this treatment from OSI and its nationally recognized doctors was obvious. A relative of Mr. Smith's had recently been treated by OSI doctors for issues related to a spine condition, and Mr. Smith was very pleased with the level of service and care his relative received from OSI and its doctors. OSI is located near his mother's home, a geographic reality that Mr. Smith believed would make follow-up appointments with Dr. Patel and other OSI personnel post-surgery easier, as he could temporarily reside at his mother's home during his recovery. Moreover, according to its website, OSI is one of the largest orthopedic practices in Orange County and it is one of Southern California's premier orthopedic medical groups.

34.     On February 3, 2020, Mr. Smith visited OSI's office at 280 S. Main St. for an appointment with one of OSI's doctors, Adam Rivadeneyra, M.D.

35.     Mr. Smith was escorted by an OSI employee to Dr. Rivadeneyra's office.

36.     During this initial visit with Dr. Rivadeneyra, Mr. Smith was counseled to undergo hip replacement surgery soon due to advanced arthritis in his left hip. Dr. Rivadeneyra recommended a follow-up appointment in May.

37.     Two months later however, experiencing worsening stiffness and near-constant pain, Mr. Smith scheduled a follow-up visit with Dr. Rivadeneyra for April 3.

38.     He was incredibly worried about the condition of his hip at this time.

39.     During the April 3 visit, Mr. Smith told Dr. Rivadeneyra that he would like to proceed with the hip replacement surgery as soon as possible. Due to the substantial pain he was experiencing and because his symptoms continued to worsen, Dr. Rivadeneyra referred Mr. Smith to an OSI orthopedic surgeon, Dr. Jay Patel.

**Treatment by Dr. Jay Patel**

40.     On April 7, 2020, Mr. Smith had a consultation with Dr. Patel concerning the hip replacement surgery. To schedule this telemedicine appointment, Mr. Smith communicated with an OSI employee following his appointment with Dr. Rivadeneyra on April 3.

41.     On the day of his appointment with Dr. Patel, an OSI employee emailed Mr. Smith a URL web address that uniquely identifies a web page through which Dr. Patel and other OSI employees conduct telemedicine appointments.

42.     During the telemedicine appointment, Dr. Patel recommended to Mr. Smith the same course of treatment as was suggested to him by Dr. Rivadeneyra—hip replacement surgery as soon as possible due to concern that Mr. Smith's hip would collapse if surgery was delayed too long.

43.     Dr. Patel agreed to perform the surgery as soon as elective surgeries were allowed again after being temporarily suspended due to COVID-19. Dr. Patel suspected this would be in May (and indeed that was the case) and set a date of May 2020 for the operation.

44.     Accordingly, an OSI employee provided Mr. Smith with OSI's pre-surgery instructions. This document, titled "Hoag Orthopedic Institute Pre-Operative Decolonization Protocol," indicated that Mr. Smith should begin following these instructions five days prior to surgery. According to the document provided Mr. Smith, he was to start this pre-operative protocol on May 16, 2020.

45.     In preparation for surgery to be performed by Dr. Patel, Mr. Smith underwent a preoperative physical exam on or around May 7, 2020 at a local urgent care facility. The exam consisted of a physical exam and assessment of Mr. Smith's medical history, including a lengthy review of his history living with HIV, his adherence to HIV antiretroviral medications, and his current HIV viral loads.

46.     The doctor who conducted Mr. Smith's preoperative physical exam concluded that neither the COVID-19 pandemic nor Mr. Smith's HIV status were risk factors and, therefore, cleared Mr. Smith for hip replacement surgery in May 2020.

47.     Following the encouraging results of his preoperative physical, Mr. Smith met with Dr. Patel on May 13, 2020 at OSI's 280 S. Main St. office for what was intended to be the final exam before Dr. Patel performed hip replacement surgery on Mr. Smith.

48.     While reviewing Mr. Smith's medical chart, including the results of his preoperative physical exam, Dr. Patel apparently first became aware of Mr. Smith's HIV status.

49.     From the moment Dr. Patel became aware of Mr. Smith's HIV status, he refused to come near Mr. Smith. Dr. Patel proceeded to question Mr. Smith in an aggressive, demeaning, and discriminatory manner, displaying a patent bias against Mr. Smith on the basis of his HIV status. Emblematic of Dr. Patel's reaction to learning of Mr. Smith's HIV status, when handing Mr. Smith a piece of paper, he did so by keeping his body as far away from Mr. Smith as he could, at arms' length.

//

//

//

//

50.     Within moments of being made aware of Mr. Smith's HIV status, Dr. Patel summarily concluded that Mr. Smith was "immunosuppressed."[1] Dr. Patel refused to perform the surgery.

51.     Dr. Patel failed to conduct an individualized assessment of Mr. Smith's medical history. Only after doing so could he have determined whether there was a legitimate risk to performing the hip replacement surgery, given Mr. Smith's HIV status.

52.     But Dr. Patel did not do this, unfortunately.

53.     In reality, if antiretroviral therapy is maintained and adhered to, people living with HIV are not immunocompromised, contrary to what Dr. Patel hastily concluded.

54.     In other words, people living with HIV are not *per se* immunosuppressed.

55.     Mr. Smith explained to Dr. Patel what was true for him and countless other people living with HIV whose viral loads are undetectable due to strict adherence to HIV medication—that he was not immunosuppressed merely because he is HIV positive.

56.     Mr. Smith explicitly told Dr. Patel that his viral load has never been anything but undetectable.

57.     Mr. Smith offered to connect Dr. Patel with his primary care physician, who has been treating Mr. Smith for approximately eight years and would have assisted Dr. Patel in making an assessment of Mr. Smith's health status. For example, Mr. Smith's

---

[1] If one's immune system is weakened, this is described as being "immunosuppressed" or "immunocompromised." This means that the individual is potentially at risk of developing "opportunistic illnesses" or other more serious diseases that are associated with AIDS.

primary care physician could have provided Dr. Patel with lab reports and other medical history concerning Mr. Smith's HIV viral load and T-cell count and whether Mr. Smith currently showed any signs of a compromised immune system.

58.     Dr. Patel ignored these suggestions. He refused to contact Mr. Smith's primary care physician or review his extensive medical records—both of which would have confirmed that Mr. Smith is not immunocompromised.

59.     Dr. Patel displayed no interest in his legal or ethical obligation to conduct an individualized assessment of Mr. Smith's medical history and health status in order to determine his fitness for the hip replacement surgery.

60.     Dr. Patel had no bona fide medical reason for refusing to treat Mr. Smith. Instead, he speculated, assumed, and applied an antiquated mentality to his treatment of Mr. Smith because he is living with HIV.

61.     According to Dr. Patel, all people living with HIV are immunocompromised.

62.     Because of his HIV status, Defendants treated Mr. Smith with a lack of care, dignity, and respect.

63.     Mr. Smith felt traumatized by Dr. Patel's stigmatization of him.

64.     After refusing to perform the surgery, Dr. Patel left the examination room, informing Mr. Smith that he was going to speak with an OSI employee, the "Director of Patient Services." Dr. Patel returned shortly thereafter, accompanied by a man who was ostensibly OSI's Director of Patient Services. The two men proceeded to provide Mr.

Smith with a document titled "Hoag Orthopedic Institute Elective Surgery Algorithm," which listed risk factors and outlined when elective surgery would be performed on patients with these risks. Attached as Exhibit 1 and incorporated herein is a true and correct copy of the Hoag Orthopedic Institute Elective Surgery Algorithm document provided to Mr. Smith.

65. On information and belief, Dr. Patel circled the "Immunosuppression" risk factor on the Hoag Orthopedic Institute Elective Surgery Algorithm prior to returning to the examination room.[2]

66. Dr. Patel used the Hoag Orthopedic Institute Elective Surgery Algorithm to create the pretense that risk associated with COVID-19 was the basis of his refusal to treat Mr. Smith. However, Dr. Patel had never raised this issue with Mr. Smith prior to providing him with the Hoag Orthopedic Institute Elective Surgery Algorithm.

67. Utilizing the Hoag Orthopedic Institute Elective Surgery Algorithm, Dr. Patel communicated to Mr. Smith that he was not eligible for surgery. By doing so, Dr. Patel reaffirmed that his refusal to treat Mr. Smith was based on stereotype, the absence of an individual assessment of Mr. Smith's health or medical history, and Dr. Patel's bias towards Mr. Smith as a person living with HIV.

_____

[2] Like "immunocompromised" or "immunosuppressed," "immunosuppression" is an indication of a reduction of the activation or efficacy of the immune system.

68.     The appointment ended moments later with Dr. Patel offering to have security escort Mr. Smith from the premises.

69.     Because Dr. Patel characterized Mr. Smith as "immunosuppressed," he was deemed "High Risk" according to the Hoag Orthopedic Institute Elective Surgery Algorithm, which was relied upon by Defendants to refuse treatment to Mr. Smith.

70.     As a result, despite his urgent need for hip replacement surgery, Mr. Smith was left without any clear sense of when, or if, Dr. Patel or any OSI physician would operate on him.

71.      Mr. Smith was extremely upset about the blatant discrimination he had suffered at the hands of a medical professional to whom he had turned for help. Because of his HIV status, Defendants forced Mr. Smith to experience trauma, humiliation, and duress.

72.     In addition, he had to endure unnecessary pain that resulted from the delay in his surgery. Mr. Smith felt angry, humiliated, betrayed, emotionally distraught, and fearful.

**Dr. Patel's Nondiscriminatory Reason for Denying Surgery Was Pretext for Disability Discrimination**

73.     According to Dr. Patel's chart notes dated May 13, 2020, Mr. Smith was refused treatment because he posed a "risk" to "the staff" due to his HIV status.

74.     This antiquated mentality ignores the fact that by taking universal precautions that are applied to all patients, there is essentially no risk of transmitting HIV

infection in a medical or surgical setting. Specifically, when an individual's viral load has been effectively suppressed by antiretroviral treatment—like Mr. Smith's—the risk of transmitting HIV to others is essentially reduced to zero.

75.     Moreover, this purported rationale is clearly pretextual, as it was never communicated by Dr. Patel in any way during the appointment when he refused to operate on Mr. Smith.

76.     On or about May 21, 2020, Mr. Smith received a letter from Dr. Patel that was on OSI stationary and signed by Dr. Patel on behalf of OSI, terminating the physician-patient relationship with Mr. Smith.

77.     This glib six-sentence letter, and the indifference with which Dr. Patel characterized the May 13 pre-surgery appointment and (lack of) care he provided Mr. Smith, triggered and exacerbated the feelings of anger, humiliation, and betrayal Mr. Smith felt as a result of Dr. Patel's actions.

**Surgery Was Successfully Completed After Dr. Patel's Discriminatory Treatment**

78.     On May 14, 2020, the day after this visit with Dr. Patel, Mr. Smith contacted his primary care physician, Jay E. Gladstein, M.D.

79.     Mr. Smith contacted Dr. Gladstein because he was in extreme pain and feared that his hip would collapse at any moment, but he was uncertain how to obtain the care he needed due to Dr. Patel's refusal to treat him.

80.     As his primary care physician for the past eight years, Dr. Gladstein was capable of determining that Mr. Smith was not immunosuppressed and thus eligible for surgery.

81.     Dr. Gladstein was shocked by Dr. Patel's discriminatory treatment of Mr. Smith and summary refusal to treat him, and referred Mr. Smith to an orthopedic surgeon affiliated with Cedars-Sinai Medical Center in Los Angeles.

82.     On May 29, 2020, Mr. Smith had a pre-surgery appointment with Dr. Guy Paiement. Mr. Smith's health insurance was billed for this appointment and he was charged a $30 co-pay, which he paid on June 12, 2020.

83.     During this appointment, Mr. Smith informed Dr. Paiement of his experience with Dr. Patel. Dr. Paiement was shocked by Dr. Patel's refusal to treat Mr. Smith.

84.     Dr. Paiement completed an individualized assessment of Mr. Smith's fitness for surgery, concluding he was in fact *not* immunosuppressed and was fit for surgery.

85.     On June 4, 2020, Dr. Paiement successfully operated on Mr. Smith's hip.

86.     Mr. Smith received a bill of $4,050 from Cedars-Sinai for his June 4 hip replacement surgery that was performed by Dr. Paiement.

//

//

//

## FIRST CAUSE OF ACTION

### Violation of Section 1557 of the Affordable Care Act (42 U.S.C. § 18116)

### (Against All Defendants)

87.     Plaintiff repeats, realleges, and incorporates by reference in this paragraph the allegations contained in this Complaint as if fully set forth herein. This Cause of Action is brought all against Defendants.

88.     Section 1557 of the Affordable Care Act ("Section 1557") states that an individual shall not, on the grounds prohibited under, *inter alia*, Section 504 of the Rehabilitation Act of 1973 ("Section 504") "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 U.S.C. § 18116.

89.     As a result of his HIV, Plaintiff has a physical impairment that substantially limits one or more of his major life activities such that he is an individual with a disability within the meaning of Section 504.

90.     As a person living with HIV, Plaintiff has a right under Section 1557 of the Affordable Care to receive health care services free from discrimination based upon his disability.

91.     In providing health care services to individuals for whom payment is made through Medicare, each Defendant conducts a "program or activity" receiving federal financial assistance within the meaning of Section 1557.

92.     As of May 13, 2020, Plaintiff experienced blatant discrimination by Defendants based on antiquated stereotypes of and stigma about people living with HIV.

93.     Defendants denied Plaintiff medical services because of his HIV.

94.     Dr. Patel was acting as an agent, employee, shareholder, owner, and/or partner of Orthopaedic Specialty Institute Medical Group of Orange County and Jay J. Patel, MD, Inc. and conducting the affairs of each when he wrote, signed, and issued the letter denying Mr. Smith medical services.

95.     At all times Plaintiff was otherwise qualified to receive the surgical healthcare services of each Defendant.

96.     Accordingly, each Defendant denied Plaintiff the benefits of, and/or subjected Plaintiff to discrimination in the provision of, the services of the program or activity conducted by Defendants solely by reason of Plaintiff's disability.

97.     By denying Plaintiff the benefits of, and/or subjecting him to discrimination in the provision of, services of the program or activity it conducts solely by reason of his disability, Defendants violated Section 1557.

98.     Defendants perpetrated this discrimination with malice, deliberate disregard for, or deliberate or reckless indifference to Plaintiff's rights.

99.     As a result of these acts of discrimination, Plaintiff has suffered physical pain, embarrassment, humiliation, emotional pain and anguish, violation of his dignity,

and loss of enjoyment of life and other compensatory damages. Plaintiff has also incurred and will continue to incur attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### Violation of the Americans with Disabilities Act (42 U.S.C. §§ 12182 *et seq*.)

### (Against All Defendants)

100.    Plaintiff repeats, realleges, and incorporates by reference in this paragraph the allegations contained in this Complaint as if fully set forth herein. This Cause of Action is brought against all Defendants.

101.    Title III of the Americans with Disabilities Act ("ADA") provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns . . . or operates a place of public accommodation." 42 U.S.C. § 12182(a).

102.    As a result of his HIV, Plaintiff has a physical impairment that substantially limits one or more of his major life activities such that he is an individual with a disability within the meaning of the ADA as defined by 42 U.S.C. § 12102.

103.    Orthopaedic Specialty Institute Medical Group of Orange County is a place of public accommodation within the meaning of the ADA, as it is a "professional office of a healthcare provider." 42 U.S.C. 12181(7)(F).

104. Jay J. Patel, MD, Inc. is a place of public accommodation within the meaning of the ADA, as it is a "professional office of a healthcare provider." 42 U.S.C. 12181(7)(F).

105. On May 13, 2020, Plaintiff was denied "the goods, services, facilities, privileges, advantages, and accommodations" of a public accommodation when Defendants refused services, namely hip replacement surgery and other medical services, to Plaintiff because of his disability, HIV.

106. Orthopaedic Specialty Institute Medical Group of Orange County denied Plaintiff the medical services of Orthopaedic Specialty Institute Medical Group of Orange County because of Plaintiff's disability, HIV, in violation of 42 U.S.C. §§ 12102 *et seq.*

107. Dr. Patel denied Plaintiff the medical services of Orthopaedic Specialty Institute Medical Group of Orange County and Jay J. Patel, MD, Inc. because of his disability, HIV, in violation of 42 U.S.C. §§ 12102 *et seq.*

108. Dr. Patel was acting as an agent, employee, shareholder, owner, and/or partner of Orthopaedic Specialty Institute Medical Group of Orange County and Jay J. Patel, MD, Inc. and conducting the affairs of each when he wrote, signed, and issued the letter denying Plaintiff medical services.

109.    As an owner and operator of Orthopaedic Specialty Institute Medical Group of Orange County and Jay J. Patel, MD, Inc., Dr. Patel is subject to individual liability for discrimination by public accommodations under 42 U.S.C. § 12182(a).

110.    Through the acts and omissions of Defendants and their agents and employees described herein, Defendants, with intent, deliberate indifference, and/or reckless disregard, denied services to Plaintiff on the basis of his disability, HIV, in violation of Title III of the ADA.

111.    As a direct and proximate result of each Defendant's discriminatory conduct, Plaintiff experienced significant physical pain, embarrassment, mental stress, humiliation, indignity, and loss of enjoyment of life and other compensatory damages.

## THIRD CAUSE OF ACTION

**Violation of Section 504 of the Rehabilitation Act (29 U.S.C. §§ 701 *et seq*.)**

**(Against All Defendants)**

112.    Plaintiff repeats, realleges, and incorporates by reference in this paragraph the allegations contained in this Complaint as if fully set forth herein. This Cause of Action is brought against all Defendants.

113.    Section 504 of the Rehabilitation Act provides in pertinent part: "No otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected

to discrimination under any program or activity receiving Federal financial assistance . . .” 29 U.S.C. § 794.

114.   At all times relevant, Plaintiff was a qualified individual with a disability within the meaning of the Rehabilitation Act, because he is living with HIV. At all times Plaintiff was otherwise qualified to receive the surgical healthcare services of the Defendants.

115.   By providing healthcare services to individuals for whom payment is made through Medicare, each Defendant conducts a “program or activity” receiving federal financial assistance within the meaning of the Rehabilitation Act.

116.   Orthopaedic Specialty Institute Medical Group of Orange County denied Mr. Smith the medical services of Orthopaedic Specialty Institute Medical Group of Orange County because of his HIV.

117.   Dr. Jay J. Patel denied Plaintiff the medical services of Orthopaedic Specialty Institute Medical Group of Orange County and Jay J. Patel, MD, Inc. because of his disability.

118.   Dr. Patel was acting as an agent, employee, shareholder, owner, and/or partner of Orthopaedic Specialty Institute Medical Group of Orange County and Jay J. Patel, MD, Inc. and conducting the affairs of each when he wrote, signed, and issued the letter denying Mr. Smith medical services.

119.   By denying Plaintiff the benefits of, and/or subjecting him to discrimination in the provision of, the services of the program or activity it conducts solely because of his disability, each Defendant violated Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794.

120.   As a direct and proximate result of each Defendant's discriminatory conduct, Plaintiff experienced significant physical pain, embarrassment, mental stress, humiliation, indignity, and loss of enjoyment of life and other compensatory damages. Plaintiff has also incurred and will continue to incur attorneys' fees and costs.

## FOURTH CAUSE OF ACTION

### Violation of The Unruh Civil Rights Act (Cal. Civil Code § 51)

### (Against All Defendants)

121.   Plaintiff repeats, realleges, and incorporates by reference in this paragraph the allegations contained in this Complaint as if fully set forth herein. This Cause of Action is brought against all Defendants.

122.   The Unruh Civil Rights Act, California Civil Code § 51, provides that "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges or services in all business establishments of every kind whatsoever."

123.   At all times mentioned herein, OSI has been a "business establishment" within the meaning of the Unruh Act, which expressly includes all business establishments "of every kind whatsoever."

124.   Through the conduct described above, Defendants, and each of them, have denied Plaintiff the full and equal enjoyment of OSI's "accommodations, advantages, facilities or services" by refusing Plaintiff hip replacement surgery and/or services to which he is entitled solely because of his disability and medical condition.

125.   As a direct and proximate result of Defendants unlawful denial of services, Plaintiff has suffered actual damages in the form of denied medical treatment, physical pain, shame, humiliation, degradation, and emotional distress due to Defendants' arbitrary and invidious discrimination on the basis of his disability. Pursuant to Cal. Civ. Code § 52(a), Plaintiff is entitled to actual damages in an amount to be determined at trial.

126.   Pursuant to Cal. Civ. Code § 52(a), Plaintiff is also entitled to such additional amount as may be determined at trial, up to a maximum of three times the amount of actual damage but in no case less than $4,000 per violation.

127.   In committing the acts described above, Defendants acted maliciously and oppressively, with a conscious, reckless, willful, and callous disregard for Plaintiff's rights, and with the intent of depriving him of rights guaranteed by the Unruh Act.

Plaintiff is therefore entitled to exemplary and punitive damages in an amount sufficient to punish and set an example of Defendants.

## FIFTH CAUSE OF ACTION

### Violation of the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*)

### (Against All Defendants)

128.    Plaintiff re-alleges and incorporates by reference all previous paragraphs. This Cause of Action is brought against all Defendants.

129.    The Unfair Competition Law provides: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus & Prof Code § 17203.

130.    A violation of a statute is grounds for a claim under the "unlawful" prong of the Unfair Competition Law.

131.    By engaging in the conduct described above, in violation of 42 U.S.C. § 18116, 42 U.S.C. §§ 12182 *et seq.*, 29 U.S.C. §§ 794 *et seq.*, and Civil Code §§ 51 *et seq.*, Defendants have violated the Unfair Competition Law.

132.    Plaintiff suffered an injury in fact and lost money or property as a result of Defendants' conduct in the form of, *inter alia*, payments to Cedars-Sinai Medical Center for his appointment with Dr. Paiement on May 29, 2020 and subsequent surgery. Plaintiff also received a bill of $100.77 from Defendants for co-payments due regarding his appointments with Dr. Patel and Dr. Rivadeneyra, which he paid on July 27, 2020. Plaintiff would not have incurred these additional costs but for Defendants' discriminatory conduct. Specifically, if Plaintiff had known Defendants would ultimately refuse to perform hip replacement surgery, he would not have proceeded with the initial consultations with Defendants and Dr. Rivadeneyra and, therefore, would not have incurred this bill from Defendants. Moreover, because of Defendants' refusal of treatment, Plaintiff had to seek treatment from another surgeon, Dr. Paiement, and incurred the cost of a $30 co-payment for the additional pre-surgery appointment, which he paid on June 12, 2020.

133.    Plaintiff was also injured by suffering physical pain, shame, humiliation, degradation, and emotional distress due to Defendants' discriminatory conduct.

134.    Plaintiff is informed, believes, and based thereon alleges that the unlawful and unfair business practices conducted by Defendants are ongoing policies and practices, such that they present a threat and likelihood of continuing discrimination against other people living with HIV and other disabling health conditions.

COMPLAINT

135.   Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff, for the benefit of the general public, seeks an order of this Court for equitable relief and/or public injunctive relief, including, *inter alia*, the following: instructing Defendants to develop and implement a written anti-discrimination policy, ensuring that they will not discriminate against any patient with HIV or other disabling conditions in the future, and to conduct mandatory training for all staff regarding HIV disease, transmission, and universal precautions.

136.   Pursuant to California Code of Civil Procedure § 1021.5, Mr. Smith is entitled to recover from Defendants reasonable attorneys' fees and costs in prosecuting this action against Defendants.

## SIXTH CAUSE OF ACTION

### Declaratory Relief

### (Against All Defendants)

137.   Plaintiff re-alleges and incorporates by reference all previous paragraphs. This Cause of Action is brought against all Defendants.

138.   A real and actual controversy over which this Court has jurisdiction now exists between Plaintiff and Defendants regarding whether Defendants may undertake to act as described herein. Plaintiff contends, and is informed and believes that Defendants deny, that by refusing to provide medical treatment on the basis of Plaintiff's disability and relying on stereotypes of the disabled rather than an individualized inquiry into the

patient's condition, Defendants fail to comply with Section 1557 of the Affordable Care Act, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and California's Unruh Civil Rights Act.

139.   A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief as follows:

1.   A declaratory judgment that the practices complained of herein are unlawful discrimination under the Affordable Care Act, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Unruh Civil Rights Act;

2.   An order for public injunctive relief requiring Defendants, their agents and employees to:

      a.   Develop and implement a written anti-discrimination policy, ensuring that they will not discriminate against any patient with HIV or other disabling health condition in the future; and

      b.   Conduct mandatory training for all staff regarding HIV disease, transmission, and precautions.

3.   Statutory and compensatory damages as permitted by law and according to proof at trial;

4.   Punitive damages according to proof;

5.    Attorneys' fees and costs of suit; and

6.    Such other relief as the Court finds just and proper.

Dated:  November 30, 2020          Respectfully Submitted,


                                   /s/ Daniel L. Sternberg
                                   Daniel L. Sternberg
                                   Jerry Flanagan
                                   Benjamin Powell
                                   CONSUMER WATCHDOG



                                   /s/ Theresa J. Barta
                                   Theresa J. Barta
                                   BARTA LAW, P.C.


                                   *Attorneys for Plaintiff Justin Smith*